**Robert Maurice BLOOM, Petitioner,**

v.

**Daniel VASQUEZ, Warden, and Attorney General of the State of California, Respondent.**

No. CV 90–2581–JSL.

United States District Court, C.D. California.

Dec. 7, 1993.

Dennis P. Riordan, San Francisco, CA, for petitioner.

Daniel E. Lungren, Los Angeles, CA, for respondent.

## CORRECTED ORDER AND OPINION ON PETITION FOR WRIT OF HABEAS CORPUS

LETTS, District Judge.

## I. INTRODUCTION

On March 23, 1992, petitioner, Robert Maurice Bloom, Jr., filed a second amended petition for writ of habeas corpus.[1] In his petition, Bloom challenges his 1983 Los Angeles County convictions of three counts of first-degree murder and his subsequent death sentence.

Bloom raises five general claims of constitutional error: (1) insufficiency of the evidence of deliberation and premeditation; (2) ineffective assistance of counsel; (3) unfair trial due to the admission of unreliable information and inadequate jury instructions; (4) invalid waiver of right to counsel at the penalty phase; and (5) jury misconduct during the penalty phase.

Before ruling on the merits of this case, the court reviewed in excess of 3200 pages of trial transcripts, conducted a four-day evidentiary hearing focusing on claims one and four above, reviewed hundreds of exhibits, and carefully considered all of the pleadings and responsive documents filed by both parties.

As discussed in detail below, the court finds that Bloom's constitutional rights were not violated at either the guilt or the penalty phase. Accordingly, Bloom's petition for writ of habeas corpus is DENIED.

## II. STATEMENT OF THE CASE

The pivotal facts of the case, as drawn from the trial transcripts, were as follows:

---

1. Bloom filed his initial petition on May 22, 1990. After conducting an investigation, Bloom filed an amended petition on February 25, 1991. The first amended petition contained claims that had not been exhausted in state court. The Court held the federal proceedings in abeyance while Bloom returned to state court to exhaust his claims. After exhausting his claims, Bloom filed his second amended petition.

Bloom's father, stepmother, and eight year-old stepsister were killed in the early morning hours of April 22, 1982. All three victims died of rifle shot wounds. Two neighbors saw Bloom leave his father's house, followed by his father. They saw Bloom shoot his father, with a rifle, outside the house and then go inside. One of the two witnesses heard shots coming from inside the house soon thereafter. Both witnesses saw Bloom leave the house and drive away. At the time of his arrest shortly after the murders, Bloom was found walking near his girlfriend's house with blood on his hands and shoes.

The prosecution's interpretation of these events was very simple. It urged that Bloom carried the rifle to the house with the intention of killing his father, had done so, and then had killed his stepmother and stepsister who had witnessed the shooting. The prosecution dismissed as unwarranted any inference that Bloom had abandoned his preexisting intent to kill when he left his father's house initially. It urged, in any event, that the evidence as to what occurred after the two met outside the house was sufficient to show premeditation.

Bloom's version differed. He contended that before the occurrence of any of the events about which the neighbors testified, his father already had shot his stepmother. Bloom testified that the killing of his father and his stepsister were precipitated by the earlier shooting of his stepmother.

This testimony was the keystone of Bloom's defense. Virtually every decision made by counsel, both as to trial strategy and tactics, was governed by Bloom's testimony. Bloom vigorously contends here that he should not have been permitted to give this testimony at all, but rather that he should have been induced to admit that he had killed all three victims and to base his defense on psychiatric testimony. For reasons given elsewhere, this court rejects this contention and proceeds from the premises that Bloom had the right to present the testimony that he offered to his counsel as

true, and that his counsel had no duty to coerce or persuade Bloom not to do so.

From these premises, it is clear that Bloom's counsel, Sherwin Edelberg, had no alternative but to shape his defense so as to make Bloom's version of the events as credible as possible. Edelberg's strategy and tactics, therefore, must be judged with this in mind. Bloom's testimony denied responsibility for the shooting of his stepmother. His testimony left Edelberg with the need to explain why the killings of Bloom's father and stepsister, for which he certainly would be held responsible, did not constitute first degree murder.

Edelberg decided to rely on the defenses of heat of passion and temporary insanity. As to the former, Edelberg was faced with the choice of presenting Bloom's response to the shooting of his stepmother: (a) as a natural response that anyone else might have had under such circumstances, or (b) as a response that stemmed more from Bloom's peculiar psychological profile. Although he did not articulate it clearly at the evidentiary hearing, Edelberg demonstrably adopted the former choice. In this regard, Edelberg relied primarily on Bloom's testimony as to the shock of seeing his father, whom he hated, shoot his stepmother, whom he loved.

Edelberg, however, did undertake to bolster Bloom's testimony with the testimony of Dr. Arthur Kling, a psychiatrist who testified that Bloom suffered from schizotypal personality disorder, a condition characterized by eccentric thoughts, bizarre fantasies, and paranoid ideation. Dr. Kling explained that persons suffering from this disorder can experience transient psychotic episodes during which they can be unaware of what they are doing. He opined that Bloom could have been suffering from such a transient episode at the time of the murders.[2]

Edelberg also introduced evidence that Bloom's stepmother had recently discovered that Bloom's father had married her with the intention of defrauding her out of her separate property.

---

**2.** On cross-examination, Dr. Kling acknowledged that he initially found Bloom sane and able to premeditate. Dr. Kling did not form his opinion about schizotypal personality disorder until after his second visit with Bloom.

Despite Edelberg's efforts, the jury found Bloom guilty of three counts of first degree murder.

## III. INSUFFICIENCY OF THE EVIDENCE

Bloom maintains that the evidence was insufficient to support a finding of deliberation and premeditation for any of the murders and asks that his convictions on all counts be reduced from first to second-degree murder.

In reviewing an insufficiency of the evidence claim brought by a state prisoner, a federal court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). In applying this standard, the court must explicitly refer "to the substantive elements of the criminal offense as defined by state law." *Id.* at 324, n. 16, 99 S.Ct. at 2792, n. 16.

■ California Penal Code § 189 defines the mental state necessary for a first degree murder conviction as "willful, deliberate, and premeditated." To prove deliberation and premeditation, the prosecution need not prove that the defendant maturely and meaningfully reflected upon the gravity of his act. *See* § 189. Premeditation is not established by reference to time as much as it focuses on the level of reflection. *People v. Thomas,* 25 Cal.2d 880, 900–901, 156 P.2d 7 (1945). A calculated judgment may be arrived at very quickly. *Id.*

■ The court concludes that a reasonable trier of fact could have found, beyond a rea-

sonable doubt, that all three murders were premeditated. Bloom does not seriously contend that the evidence of his conduct in the time period shortly before the shootings was insufficient to show premeditation. This evidence included testimony that Bloom procured a rifle and practiced with it two nights before the shooting, that he also tried to acquire a handgun, and that he told his father that he was through controlling Bloom's life. That evidence was more than enough to demonstrate premeditation.

Bloom contends, however, that this evidence should be disregarded. He asserts that independent testimony, which showed that before shooting his father outside the house Bloom had entered and left the house without apparent incident, negated any inference of premeditation which might have arisen from his earlier conduct. Specifically, Bloom urges that any preexisting intent which he might have harbored before going to the house had been abandoned by the time he left without taking action.

The court disagrees. While Bloom's decision to leave the house clearly reflected the decision not to act *right then,* it did not clearly reflect a decision to abandon the intent ever to act at all. In the face of the other evidence, a reasonable juror need not have concluded that Bloom had abandoned all homicidal intent, simply because he left the house once before acting.[3]

Moreover, even if one were to conclude that Bloom did abandon the premeditated intent to murder which was formed before he left the house the first time, the evidence of the methodical way Bloom went about the murder of his father, stepmother and sister was more than sufficient to show premeditation without reference to any of Bloom's prior acts.[4]

---

**3.** In every instance where the Court adopts an inference that is favorable to the prosecution, it does so under the guidance of *Jackson:*

A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not appear from the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. 443 U.S. at 326, 99 S.Ct. at 2793.

**4.** The evidence at trial supported a finding that Bloom premeditated the murders of his stepmother and stepsister: (1) Bloom went to his father's house with a loaded rifle in the middle of the night with no reason to believe that his stepmother and stepsister would not be there; (2) after killing his father outside, he reloaded his rifle and entered the house; (3) he inflicted injuries on his stepmother and stepsister, evidencing an intent to kill; and (4) after the murders he left in his stepmother's car, which he later abandoned, disposed of the rifle in such a manner

Most importantly, perhaps, Bloom's testimony, which the jury obviously did not believe, permitted the jury to draw an inference of premeditation against him. Bloom, in his testimony, attempted to explain away damaging evidence as to premeditation by weaving an elaborate story about how he chased two prowlers, with a rifle in hand, from his girlfriend's house to a point near his father's house, abandoned the pursuit, and entered his father's house, whereupon his father obtained possession of the rifle and shot Bloom's stepmother.

Bloom's sophisticated attempt to refute the evidence against him, if not believed, could give rise to an inference that Bloom was conscious of his own guilt[5] and that the evidence against him was true. Bloom's decision to tell that story was a significant gamble: if the jury believed that Bloom did not shoot his stepmother, he had a chance to go free or at least not be convicted of first degree murder; if the jury did not believe him, he certainly would be convicted of first degree murder on all three counts. Bloom lost this gamble. Moreover, Bloom produced independent evidence of premeditation by fabricating a story designed to refute the prosecution's evidence of premeditation.

There was sufficient evidence to convict Bloom of first degree murder on all three counts.

## IV. SIXTH AMENDMENT VIOLATIONS AT THE GUILT PHASE

Bloom asserts that his Sixth Amendment rights were repeatedly violated at the guilt phase of his trial. Most of his claims allege ineffective assistance of counsel. Each claim is addressed below.

### A. *Standard for Reviewing Ineffective Assistance of Counsel Claims*

In analyzing whether Edelberg's counsel was constitutionally ineffective, the court considers two issues: First, whether counsel's performance was deficient, falling below an objective standard of reasonableness viewed from the time of representation; and second, whether that deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). Bloom bears the burden of satisfying both of these requirements. *Id.*

■ In gauging the reasonableness of an attorney's investigation, the information supplied by the defendant is especially relevant. *Id.* at 691, 104 S.Ct. at 2066. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.*

■ Edelberg's strategic and tactical decisions were governed by the story told by Bloom. Bloom's challenges stem from his assertion that Edelberg should have ignored his account of the murders and argued a different defense. As discussed below, this assertion is invalid. Edelberg was required to bolster Bloom's basic story as best he could, but was not required to force Bloom to recant and admit killing his stepmother. Thus, Bloom's constitutional challenges, which are premised on the incorrect notion that Edelberg should have disbelieved Bloom's story and presented a different defense, necessarily fail.

### B. *Improper Strategic Decisions*

Bloom faults Edelberg for a number of errors and omissions relating to strategic pre-trial decisions. Bloom maintains that the defenses of heat of passion and temporary insanity were ineffectively prepared and presented and that the innocence defense was incompetently conceived and was contrary to the evidence presented by the prosecution.[6]

that it has never been found, and was on his way back to his girlfriend's house when he was arrested.

5. 2 Edward J. Devitt, Charles B. Blackmar, Michael A. Wolff and Kevin F. O'Malley, *Federal Jury Practice and Instructions: Civil and Criminal* § 14.06 (4th ed. 1992); 1 Paul G. Brecken-

ridge, Jr., Aurelio Munoz, *California Jury Instructions: Criminal* 27 (5th ed. 1988).

6. Bloom also argues that Edelberg should have presented a psychiatric defense focused on lack of premeditation. Indeed, many of Bloom's exhibits support this theory. In his pre-hearing papers, however, Bloom correctly retreats from

To support these arguments, Bloom highlights specific examples of Edelberg's shortcomings.

### (1) *Presenting Ineffective Defenses*

In examining Edelberg's preparation and presentation of the defenses, the court starts with the premise that an attorney's actions are shaped by his client's strategic choices. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Here, despite some initial variations in describing the night of the murders, Bloom settled fairly quickly on the story he told at trial. [HT 1/185–186.][7] In addition, Bloom was adamant, almost from the start, that he was going to testify at trial to the story he was telling Edelberg. [HT 1/194–195.] Edelberg found Bloom to be logical, coherent, and rational; therefore, he had no reason to question the underpinnings of Bloom's story any further than necessary to achieve a cogent and presentable defense. [HT 1/186–187, 198–199.][8]

Given that Edelberg found Bloom to be competent, this court would consider it to have been professionally inappropriate for Edelberg to attempt to disprove Bloom's story or attempt to convince Bloom that a different story or defense would be better. Indeed, the court finds the contention alarming that Edelberg had a constitutional duty to get Bloom to alter the story that he asserted to be true.

Even truthful explanations of innocence may be highly implausible, but defendants have the right to make such explanations to the jury. It risks serious undermining of this right to suggest that the defendant's right to speak may be exercised only after the defendant's own lawyer has exercised a constitutional duty to go to maximum lengths

to make the defendant see that he will not be believed.

This was not a case in which it behooved Edelberg to demonstrate to Bloom that his testimony was objectively incredible for the purpose of inducing him to waive his right to testify. If Bloom did not testify, he stood no chance of acquittal. Furthermore, despite some initial variations, Bloom settled on the story which he told at trial relatively early in the proceedings and he was determined to testify from that point forward.

So long as a criminal defense lawyer does not knowingly suborn perjury, and Edelberg never believed that he was suborning perjury by allowing Bloom to testify as he did, he has the duty to help his client present the best available defense consistent with the version of events that his client asserts to be true. [HT 1/191–192.] While no doubt the lawyer also has the duty to point out how cross-examination may highlight the least credible aspects of his client's testimony, the thought that the lawyer must do so to the point of persuading the client that even his lawyer does not believe him goes much too far.[9]

Indeed, Edelberg's belief in Bloom's story grew as he found circumstantial evidence to corroborate it. [HT 1/202–203.] Edelberg's investigator found evidence that Bloom's father married Bloom's stepmother as part of a fraud to acquire her property. In addition, Edelberg was able to document Bloom's father's history of violence against Bloom and two former wives. Edelberg recognized that Bloom's story had its flaws—most notably its inconsistencies with one neighbor's testimony that Bloom's stepmother screamed after Bloom's father was shot and the evidence that there were no blood stains on his stepmother's hands and near her bedroom. Ne-

this position. Bloom concedes that his state of mind at the time of the murders would be relevant only to demonstrate prejudice in the event the court was to find that Edelberg's representation was constitutionally deficient.

7. "HT" refers to the evidentiary hearing transcripts. "RT," cited later, denotes the reporter's transcripts of the trial. The number to the left of the slash refers to the volume number. The number to the right of the slash indicates the page number.

8. At the evidentiary hearing, Edelberg ably defended the choices he made and the actions he took while representing Bloom. The Court found that Edelberg's answers and demeanor on the witness stand lent much credibility to his testimony.

9. This is particularly true in a case like this where attorney-client relations were admittedly difficult and fragile. The fact is, however, that Edelberg did believe Bloom's testimony. [HT 1/239–240.]

vertheless, Edelberg believed that Bloom's story might be true. He could not force Bloom to change his testimony simply because Bloom told an unlikely story.

The knowledge that Bloom would testify and that his testimony would implicate his father with his stepmother's murder shaped Edelberg's choices in defending the other two murders. Psychiatric evidence designed to portray Bloom as mentally disturbed prior to the murders would have destroyed Bloom's credibility. Presenting strong psychiatric evidence of insanity would leave Edelberg in the position of relying on Bloom's version of the murders while simultaneously attacking Bloom's competency to testify. Instead, Edelberg focused on a heat of passion defense. This defense required nothing more than Bloom's testimony, bolstered by the kind of psychiatric evidence offered by Dr. Kling to the effect that Bloom was even more vulnerable than others in his response to the horror of seeing his father shoot his stepmother.

Finally, Edelberg presented the only available defense to stepsister's murder: That Bloom was temporarily insane. Bloom stated that he did not remember killing his stepsister. Dr. Kling testified that Bloom may have experienced a temporary amnesic state brought on by the trauma of shooting his father, during which time he lost touch with reality. Thus, temporary insanity was a credible defense to the stepsister's murder.

The court does not dispute Bloom's contention that Bloom's defense could have been presented better, or that Edelberg could have presented different mental state defenses. In raising ineffective assistance of counsel claims, habeas petitioners often assert that a different trial strategy would have produced more favorable results. *See Lockhart v. Fretwell*, — U.S. —, —–—, 113 S.Ct. 838, 843–44, 122 L.Ed.2d 180, 190–191 (1993). This case is no different. The ability to fashion a different and perhaps better defense years later is irrelevant if the defense presented was a reasonable tactical decision. Edelberg made reasonable strategic choices based on Bloom's anticipated testimony and on the information made avail-able to him. The Constitution requires nothing more.

#### (2) *Inadequate Time to Prepare*

Bloom argues that Edelberg did not spend enough hours meeting with him to prepare adequately for trial. This argument depends on Bloom's faulty premise that Edelberg should have forced Bloom to change his story and pursued an insanity defense. Once Edelberg learned Bloom's relatively simple story, he needed to find extrinsic evidence to support it.

Edelberg's time sheets show that he spent an estimated sixty-one hours visiting Bloom in jail. Given Edelberg's trial strategy, this appears reasonable. Bloom's story was not factually complex. During those sixty-one hours, Edelberg obtained a version of the events that fairly squared with the evidence, came to appreciate that Bloom was adamant about testifying, and learned that Bloom would not accept a plea that would give him life without the possibility of parole.

■ The total number of hours is irrelevant in any event since brevity of contact between defendant and counsel, without more, will not sustain an ineffective assistance of counsel claim. *See Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984). Bloom has not demonstrated that Edelberg's failure to expend sufficient time and energy impaired the defense. *See United States v. Taylor*, 802 F.2d 1108, 1119 (9th Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987).

#### (3) *Delayed Psychiatric Examination*

■ Edelberg explained that he waited to employ Dr. Kling until ten months after receiving approval from the trial court, hoping to get "something a bit more objective out of the client," something "that would tend to show irrationality." [HT 1/208.] Prior to actually engaging Dr. Kling, Edelberg had not observed any obvious manifestations of mental disease or defect in Bloom. The court is satisfied that the delay in hiring Dr. Kling was a reasonable tactical decision in light of the defense theory of the case. Bloom suffered no prejudice as a result.

### (4) *Not consulting with Dr. Kling Before He Wrote His First Report*

■ Edelberg testified that he prefers to have an expert examine the client prior to his conferring with the expert to prevent tainting or influencing the expert. [HT 1/139–140.] While not necessarily ideal, the court finds this to be a reasonable tactical choice given the defense theory.

### (5) *Failing to Provide Dr. Kling with Proper Guidance*

Bloom contends that had Edelberg discussed the case more thoroughly with Dr. Kling, Dr. Kling would have been able to support a psychiatric defense based predominantly on the abuse of Bloom by his father. Bloom also faults Edelberg for failing to provide Dr. Kling with the myriad of documents and reports on Bloom's background compiled by his current counsel. *See* Petitioner's Exhibits 19–110, 121. Apparently, Edelberg never obtained Bloom's prior psychiatric reports and other documents that might have supported a psychiatric defense, nor did Dr. Kling seek such documents. [HT 1/211–212.]

■ In the absence of a specific request, an attorney is not responsible for gathering background material that might be helpful to a psychiatrist evaluating his client. Accordingly, an attorney cannot be found incompetent for failing to gather such documents. *See Card v. Dugger*, 911 F.2d 1494, 1511–1512 (11th Cir.1990); *Smith v. Dixon*, 766 F.Supp. 1370, 1390 (E.D.N.C.1991), *aff'd*, 996 F.2d 667, 679 (4th Cir.1993).

■ In addition, Bloom's assertions do not reflect the reality of Edelberg's approach. Edelberg, for the reasons discussed above, chose to present defenses based on innocence, heat of passion and temporary insanity. Dr. Kling's testimony supported these defenses. Had Edelberg opted for a psychiatric-based lack of premeditation defense, then Bloom's contentions might have some merit. Edelberg, however, was not ineffective for failing to provide Dr. Kling with information that would have supported a defense not presented.

As discussed below, Edelberg gave Dr. Kling sufficient guidance and information. Accordingly, Bloom's challenge must fail.[10]

Both respondent's expert psychiatrist, Dr. John Stalberg, and the court's appointed psychiatrist, Dr. Mark Mills,[11] opined that the information Dr. Kling received was greater than most forensic psychiatrists receive before offering their opinions.[12] Drs. Stalberg and Mills further stated that previous psychiatric evaluations and other mental health background documents would have bolstered

10. Prior to his initial evaluation of Bloom, Dr. Kling received from Edelberg's office: Dr. Kling's order of appointment and a series of questions he was to address, a copy of the police report, a transcript of the preliminary hearing, two of Bloom's school assignments, a nine page letter to a Los Angeles Superior Court Judge from Bloom's mother detailing background information on Bloom, a three page list of odd things that Bloom's mother had observed Bloom doing, a fourteen page "autobiography" of Bloom's mother, copies of fourteen letters and telegrams that Bloom's father sent to Bloom while Bloom was in the Navy, Bloom's certificate of scholastic award from his high school's home economics department, Bloom's honorable discharge from the Navy, and a recent neurologist's report, including an EEG report. *See* Respondent's Exhibit 215(a–j).

11. At the evidentiary hearing, the Court appointed Dr. Mills, a psychiatrist and juris doctorate, to be the Court's own expert in assessing the psychiatric issues present in the case. Dr. Mills reviewed the evidence admitted at the hearing, heard the psychiatric testimony, and then offered his views on the psychiatric issues.

Originally, the Court expected Dr. Stalberg and Bloom's expert psychiatrist, Dr. Philip Wolfson, to offer widely disparate opinions. The Court's primary purpose in appointing Dr. Mills was to narrow this gap. Dr. Mills performed this function admirably by meeting with Drs. Kling, Wolfson and Stalberg in advance of the hearing. This meeting resulted in the narrowing of the disputed psychiatric issues.

Dr. Mills' psychiatric opinion also confirmed and strengthened the Court's own views. His testimony was particularly useful in highlighting the relative credibility of the psychiatrists who testified at the hearing.

12. Dr. Wolfson disagreed. Significantly, both Dr. Stalberg and Dr. Mills are board-certified in forensic psychiatry and have had extensive involvement with court appointments in criminal cases. Dr. Wolfson, however, lacks certification in both forensic and general psychiatry and has participated in only five criminal cases.

Dr. Kling's testimony, but would not have significantly altered his views.

The court finds that while Edelberg could have provided Dr. Kling with better instruction on his theory of the defense, Dr. Kling was adequately prepared to assist Edelberg. Bloom, therefore, was not deprived of any constitutional right.

### (6) *Failing to Offer Other Psychiatric Testimony*

Based on the defenses presented, Edelberg had no good reason to present more or different psychiatric opinions. Dr. Kling's opinions supported Edelberg's defense. [HT 1/150–151.] To the extent Bloom is suggesting that Edelberg should have used another psychiatrist because of Dr. Kling's initial report, the court rejects that notion. Edelberg explained that in his professional opinion, Dr. Kling, with his excellent reputation, would be a better witness despite his change of opinion following a second evaluation, than would another psychiatrist. [HT 1/147–152.] The court finds this to be a reasonable strategic choice.

### C. *Improper Tactical Decisions*

Bloom also criticizes Edelberg for making several improper tactical decisions during trial.

### (1) *Dr. Kling's First Report*

 Bloom argues that Edelberg should have elicited the contents of Dr. Kling's first report on direct examination, or at least should have objected to the admission of the report on cross-examination. Bloom has failed to rebut the presumption that Edelberg's decision was a reasonable tactical choice.

Trial lawyers often confront hard choices between defusing negative information by eliciting it on direct examination rather than allowing it to be raised on cross-examination and addressed on redirect examination. The

choice of one over the other, even if wrong, has no constitutional dignity.

Moreover, the choice was not clearly wrong. Dr. Kling's first report primarily concerned Bloom's mental capacity at the time of the murders. Dr. Kling's statements, while not helpful to the defense, were not inconsistent with the defenses presented. Bloom's denial of the killing of his stepmother, and Edelberg's decision to emphasize the events of that night in his heat of passion defense are based on the presumption that but for these events, Bloom would have been capable of premeditation.

Bloom also argues that, even if Edelberg's failure to elicit the substance of Dr. Kling's report on direct examination was not constitutional error, Edelberg should have objected to its discussion on cross-examination because Dr. Kling's opinions were inadmissible under California Penal Code § 28.[13] Even if the testimony was inadmissible, "[a]n attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective." *Morris v. California,* 966 F.2d 448, 456 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). Whether or not the evidence was admissible, Bloom has failed to overcome the presumption that Edelberg's lack of objection was a sound trial tactic.[14]

The court need not determine the actual explanation for Edelberg's failure to object because Edelberg's failure to do so fell within the range of reasonable representation. *Id.* Furthermore, as discussed above, Dr. Kling's cross-examination testimony, while not helpful to the defense, was not prejudicial.[15] The fact that Bloom had the mental capacity to commit murder, to deliberate and premeditate, to harbor malice, and to meaningfully and maturely reflect upon the gravity of his acts does not mean that Bloom's father did not kill his wife, that Bloom did not kill his

---

**13.** California Penal Code § 28 forbids the admission of evidence of mental disease, defect or disorder to show or negate the capacity to form a specific mental state.

**14.** Although Bloom called Edelberg as a witness at the evidentiary hearing, he did not question him about his decision not to object.

**15.** Dr. Wolfson, Bloom's expert, agreed that the issue of whether someone has the mental capacity to form a specific mental state is quite different than the issue of whether someone actually formed a particular mental state. [HT 2/310.]

father in the heat of passion, and that Bloom did not kill his stepsister while in a temporary amnesic state.

### (2) *Failure to Present Evidence Linking Child Abuse and Parricide*

■ Bloom faults Edelberg for failing to research the relationship between child abuse and parricide. Had Edelberg done so, Bloom submits, he would have been able to explain how years of abuse caused Bloom to explode in a burst of violence that killed not only his father, the abuser, but the other family members who were present. Once again, this contention proceeds from the premise that Bloom should have testified differently.

In any event, the court finds no relevant support for this claim. Bloom offers a declaration by Paul Mones, an attorney specializing in the defense of children accused of parricide. While Mones writes at length about his work on parricide cases, his views are not germane to this case, which was tried in 1983, since Mones did not start working on parricide cases until 1986, and it is his post–1986 work which forms the basis for his current views on the proper way to try parricide cases.[16]

Despite the three-year gap between Bloom's trial and the development of parricide profiles, Mones postulates his theory of the defense of parricide cases, points out where Edelberg deviated, and concludes that Edelberg was ineffective. The court will not give constitutional dignity to defense strategies followed by particular attorneys. Indeed, the court has serious reservations about any strategy that purports to be applicable across a span of cases. The uniqueness of parricide cases and the uniqueness of defense attorneys defy an across-the-board ap-

plication of trial strategy. Edelberg did not deprive Bloom of any constitutional right by failing to retain a parricide expert or to present a parricide defense.

### (3) *Failure to Object to Statements Made During Closing Argument*

Bloom argues that Edelberg should have objected to two statements made by the prosecutor during closing argument at the guilt phase: (1) the prosecutor opined that when the defense does not have anything going for it, it will often create diversions such as blaming someone else or claiming a blackout. [RT 39/4651–4652]; (2) the prosecutor described Bloom as the "evil incarnate" and compared him to Fu Manchu. [RT 41/4843.] [17]

■ Absent egregious misstatements, a defense attorney's failure to object during closing argument will not fall below acceptable parameters of attorney conduct. *U.S. v. Necoechea,* 986 F.2d 1273, 1281 (9th Cir. 1993); *U.S. v. Molina,* 934 F.2d 1440, 1448 (9th Cir.1991). Because the prosecutor's comments cannot fairly be described as "egregious," Edelberg's failure to object was neither unreasonable, nor prejudicial.

### (4) *Failure to Request Instruction on Abandonment of Premeditation*

■ Bloom contends that his two retreats from his father's house show that he abandoned his intent to kill his father and therefore Edelberg should have requested a jury instruction that a prior intent to kill will not support premeditation if the intent is abandoned prior to the execution of the plan. Bloom's claim is without merit.

The trial court instructed the jury on the elements of first degree murder. [RT

---

16. Mones' suggests in his declaration that there were numerous sources of information on parricide available at the time Edelberg represented Bloom. However, judging by the titles of the twenty cited articles, only a few seem relevant to the defense of Bloom's case. Moreover, the articles are from medical and sociological references, not from legal sources. Lawyers are responsible for knowing developments in other disciplines only to the extent that such developments can be found in the legal literature and perhaps in the popular press. Edelberg will not be held

responsible for failing to find all existing information on all possible theories.

17. In his direct appeal, Bloom argued that the above two statements constituted prosecutorial misconduct. The California Supreme Court rejected that argument because counsel failed to object or seek an admonition. *People v. Bloom,* 48 Cal.3d 1194, 1213, 259 Cal.Rptr. 669, 774 P.2d 698 (1989). Bloom has now reformulated this argument as an ineffective assistance of counsel claim.

39/4544–4546.] The instruction included a definition of "premeditation" and a caution that the intent to kill "must have been formed upon pre-existing reflection and not under a sudden heat of passion...." [RT 39/4544.] Based on these instructions, the California Supreme Court concluded that "no reasonable juror would have believed that a premeditated finding could be made despite an abandonment of premeditated intent prior to the slaying." *People v. Bloom,* 48 Cal.3d 1194, 1211–1212, 259 Cal.Rptr. 669, 774 P.2d 698 (1989). This court agrees. While an abandonment instruction might have highlighted the point, Edelberg's failure to request the instruction does not rise to the level of professional incompetence.

### D. Denial of the Right to the Effective Assistance of a Psychiatric Expert

■ Citing *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Bloom asserts that Dr. Kling's ineffectiveness violated his constitutional right to a competent psychiatric evaluation. Bloom claims Dr. Kling failed to obtain an accurate medical and social history and failed to consult with sources other than Bloom. This attack on Dr. Kling's performance cannot survive either legal or factual scrutiny.

*Ake* holds that when a defendant's sanity at the time of the offense will be a factor at trial, the state must provide an indigent defendant with psychiatric assistance. *Id.* at 74, 105 S.Ct. at 1091. The assistance includes the services of a competent psychiatrist who will conduct an examination and assist counsel in evaluating, preparing and presenting the defense. *Id.* at 83, 105 S.Ct. at 1096.

*Ake* does not provide a legal basis for challenging in a federal habeas corpus proceeding the competency of the defense psychiatrist used at trial. *Harris v. Vasquez,* 949 F.2d 1497, 1517–1518 (9th Cir.1991). Habeas corpus is available to ensure the accuracy and fairness of criminal trials. *Id.* at 1520. Allowing a defendant to raise a constitutional challenge to his death sentence

a decade later by presenting new psychiatric opinions does not further the goals of fairness and accuracy. *Id.* Accordingly, federal habeas will not serve as a "psychiatric medical malpractice review." *Id.*

The law requires only that a competent attorney select a competent psychiatrist. There is no question that Dr. Kling was extremely well qualified to serve as an expert for Bloom. At the time of his appointment, Dr. Kling was Vice Chairman of the Department of Psychiatry at U.C.L.A., Chief of the Psychiatry Service at the Sepulveda V.A. Medical Center and a member of the forensic panel for the Los Angeles County Superior Court. [RT 37/4376; HT 2/398.] Dr. Kling had close to one hundred publications focusing primarily on the relationship between brain function and behavior and had ten years of experience as a psychiatric consultant for the New Jersey Department of Corrections. [RT 37/4377.] Dr. Kling also had testified in one or two previous criminal cases, including one murder case. [HT 2/379.] In short, Dr. Kling was well-credentialed and experienced.

Once an attorney has selected a competent psychiatrist, the attorney has met his constitutional obligations vis-a-vis obtaining psychiatric assistance. The Constitution does not recognize a right to the effective assistance of a psychiatrist or the effective assistance of a witness.[18] *Harris,* 949 F.2d at 1517–1518. Bloom's claim that he received ineffective assistance of a psychiatrist must be denied.

### E. Problems With Bloom's First Attorney

Bloom asserts that his original attorney, Howard Beckler, withdrew from the case after the preliminary hearing because he could not cope with Bloom's confession that he killed all three victims. After Beckler withdrew, he did not help Edelberg to establish a relationship with Bloom and failed to provide Edelberg with all of the relevant information he had gathered during his representation. Bloom claims that Beckler's

---

18. Even if a "competency of the psychiatrist review" was appropriate, Bloom has not established that Dr. Kling was incompetent. To the contrary, Drs. Mills and Stalberg found Dr. Kling's work to be quite competent. [HT 3/585, 652–653, 664.]

withdrawal caused him to feel abandoned and unable to confide in his new counsel.

Relying heavily on Beckler's testimony, the court finds no constitutional deficiency in Beckler's performance, nor any constitutional error in Edelberg's representation as affected by Beckler. Beckler testified that, for financial reasons, Bloom's mother retained him only through the preliminary hearing. Bloom presented no evidence to support his claim that Beckler withdrew after the preliminary hearing due to Bloom's graphic confession. Beckler further explained that he never discussed Bloom's case with Edelberg or provided Edelberg with any information because he believed he would have been constrained from releasing any information without a written waiver of the attorney-client privilege from Bloom. The court agrees with Beckler's understanding of the attorney-client privilege.[19] Bloom's claim on this ground is denied.

### F. Conclusion

Bloom has failed to establish that Edelberg's actions, either individually or collectively, violated any aspect of Bloom's Sixth Amendment rights.

### V. UNFAIR TRIAL

Bloom contends that his trial was fundamentally unfair because: (a) Dr. Kling's first report should not have been admitted; and (b) the jury should have been instructed that evidence of mitigation presented in the guilt phase could be considered at the penalty phase. These two errors, Bloom argues, require reversal of the jury's decision to prevent any risk that the jury returned a death verdict in spite of factors calling for a lesser penalty.

### A. Dr. Kling's Report

Bloom contends that the prosecutor's use of Dr. Kling's first report rendered his convictions and sentence unreliable in violation of the Eighth and Fourteenth Amendments because the admission violated California law and was based on inadequate and incorrect

---

**19.** The Court further notes that Bloom, after having confessed to Beckler, would have no rational reason for wanting Edelberg to have Beckler's

information. To support this claim, Bloom cites a number of cases discussing the need for reliability in information presented to death penalty juries. However, none of these cases contain a reliability question of the nature posed by Bloom.

Any contention that the statement was improperly admitted under California law must fail since federal habeas relief is not available for errors of state law, but is confined to determining whether a violation of the Constitution, laws, or treaties of the United States has occurred. *Estelle v. McGuire,* — U.S. —, —, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).

Bloom's argument that his trial was fundamentally unfair must also fail. Bloom cannot demonstrate either factually or legally that the admission of Dr. Kling's report produced an unfair trial. For Bloom to prevail on this claim, he must demonstrate that Dr. Kling's first report was erroneous and that the admission of the "inaccurate" report rendered his trial unconstitutional. Bloom has made neither showing.

Dr. Kling's based his initial report almost entirely on his interview with Bloom. *See* Petitioner's Exhibit 20. Bloom's present contention that the report is inaccurate and untrue rests on the proposition that what he told Dr. Kling was inaccurate and untrue. Habeas relief is not justified or required when a defendant misrepresents facts to a psychiatrist and then later attacks the psychiatrist's opinion as erroneous because the facts upon which it is based are false.

The court finds no basis for holding that the admission and consideration of Dr. Kling's report was unconstitutional.

### B. Jury Instruction

Bloom maintains that the trial court should have instructed the jury explicitly that mitigating evidence introduced at the guilt phase must be considered at the penalty phase. Bloom contends that, absent instruction from the court, the attorneys should

---

file information since Bloom changed his story about the murders by the time Edelberg began representing him.

have told the jury during argument that the record contains evidence of mitigation that must be considered. Instead, the prosecutor led the jury to believe that Bloom presented no evidence in mitigation. Bloom perpetuated this erroneous conclusion, by stating in his closing comments, "there ain't no mitigating circumstances."

"An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977). A review of the jury instructions given at the penalty phase of Bloom's trial leaves no doubt that the jury knew it could consider any mitigating evidence from the guilt phase. The judge instructed the jury: "In determining which penalty to impose upon the defendant, you shall consider all of the evidence which has been received during any part of the trial, *including the guilt phase.* You shall consider, take into account, and be guided by the following factors, if applicable: [The court then listed the 11 statutory factors to be considered in all death penalty cases]." [RT 44/5062–5063 (emphasis added).]

It cannot be said that this instruction would lead the jury to believe it could not consider guilt phase evidence for all factors, including mitigating factors. Accordingly, the omission of a more specific instruction was neither prejudicial, nor unconstitutional.

## VI. PENALTY PHASE FACTS

Following Bloom's conviction on three counts of first-degree murder, the trial court granted Bloom's request to represent himself at the penalty phase. At Bloom's request, Edelberg served as co-counsel. Bloom told the court when he made his request that he was intending to seek the death penalty and would not be offering any mitigating evidence.

At the penalty phase hearing, the prosecution presented evidence that four months prior to the murders, Bloom had been arrest-

ed for pulling a gun on a woman at a Bible study meeting and attempting to steal the woman's purse. Bloom, on cross-examination, elicited testimony that he had also been a suspect in the attempted robbery of an elderly couple. A police officer who had stopped Bloom for walking oddly down the street while carrying a BB gun testified that Bloom had threatened to shoot the officers. Bloom presented no evidence and told the jury that he deserved to die and wanted to die.

The jury returned a death sentence after less than four hours of deliberation.

## VII. SIXTH AMENDMENT VIOLATIONS AT THE PENALTY PHASE

Bloom argues that his waiver of his right to counsel and his motion to represent himself at the penalty phase for the purpose of seeking the death penalty were invalid and deprived him of his Sixth Amendment right to counsel. Bloom bases this claim on two arguments: (1) that his waiver was a product of the same mental illness that prompted the murders and (2) that his waiver was not knowing and intelligent because it resulted from a breakdown of his attorney-client relationship with Edelberg.

### A. *Bloom's Incompetency to Waive His Right to Counsel*

Bloom stands before this court claiming that he was not competent to waive his right to counsel and asking for a new penalty phase to remedy a supposed constitutional violation. Bloom's only evidence in support of this claim is declarations from mental health professionals who examined Bloom ten years after he chose to represent himself at the penalty phase.[20]

The court finds the declarations unpersuasive. Dr. Kling found Bloom competent to stand trial in August, 1983. In June, 1984, six months after Bloom obtained pro per status, a jury found him competent to be

---

20. Bloom provided the Court with declarations from Dr. David Lisak, Dr. William Vicary, Dr. Donald Verin, Joni Diamond, L.C.S.W., and Dr. Dale Watson, as well as a report from Dr. Wolfson. The declarations of Drs. Vicary and Verin, and the declaration of Diamond were not signed until May 11, 1993, the day before the evidentiary hearing began and were not presented to respondent or the court until the first day of the hearing.

sentenced. Bloom argues that competency to be sentenced cannot be compared to competency to waive counsel, relying on *Moran v. Godinez,* 972 ·F.2d 263 (9th Cir.1992), *rev'd,* —— U.S. ——, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). As indicated, however, the United States Supreme Court recently reversed *Moran,* holding that the Due Process Clause does not require the standard for competency to waive the right to counsel to be higher or different than the standard for competency to stand trial. *See Godinez v. Moran,* —— U.S. ——, ——, 113 S.Ct. 2680, 2688, 125 L.Ed.2d 321, 334 (1993). The court finds the two findings of Bloom's competency, framing the relevant penalty phase period, to be compelling evidence that Bloom was competent to waive counsel at the penalty phase. Even if the court did find the declarations relevant, Drs. Mills and Stalberg independently concluded that they believed Bloom to be competent, and the court finds these witnesses to be more persuasive.

In addition, the observations of those who saw Bloom in December, 1983 at the penalty phase are important indications of Bloom's competency. In this regard, the comments of the trial judge at the time of Bloom's request are quite revealing: "We have been involved in this jury selection and this jury trial since sometime late September, and in that period of time, obviously I have had ample opportunity to observe you on the record, off the record, et cetera. It is clear to me that you possess sufficient intellect to understand the proceedings, to read, to write, to address yourself to the court and to the jury. It is also clear that you understand the gravity of the situation." [RT 42/4875–4876.]

Likewise, Edelberg found no reason to question Bloom's competency and concurred, albeit reluctantly, with Bloom's request to represent himself. The two people in the best position to judge Bloom's competency at the time· of the penalty phase, the trial judge and Bloom's attorney, found no reason to question Bloom's competency to represent himself and to seek the death penalty.[21]

In addition, this court's review of the penalty phase transcripts did not illuminate any obvious incompetency on Bloom's part. Indeed, at some point after the penalty phase had concluded, the trial judge observed, "[Bloom] appeared before the jury and pled and pled rather eloquently for the death penalty." [RT 45/5099.] On another occasion the judge told Bloom, "[y]ou sought the death penalty and you achieved that goal. You did a wonderful job for yourself. Keep doing a wonderful job for yourself and we will let you file whatever motions you believe are appropriate." [RT 45/5109.]

Bloom has not demonstrated to this court that he was incompetent to waive counsel and perform in a co-counsel capacity. The court finds the contemporaneous opinions of Edelberg and the trial judge to be highly persuasive. In addition, the court finds it relevant that a jury found Bloom competent to be sentenced only six months after Bloom obtained co-counsel status. The trial record is replete with references to Bloom's mental state deteriorating after the penalty phase concluded. Accordingly, it would be difficult to reconcile a finding of competency after an observed deterioration of mental function with a finding of incompetency to waive counsel prior to the deterioration.

The record before this court does not support a finding that Bloom was incompetent to represent himself and to seek the death penalty.[22] Accordingly, Bloom suffered no Sixth Amendment violation by representing himself at the penalty phase.

---

21. Six months after the penalty phase, Edelberg sought and obtained a competency hearing to assess Bloom's competency to be sentenced. From this, it can be inferred that both Edelberg and the trial judge were familiar with and capable of initiating competency proceedings.

22. The record suggests that Bloom's decision to *represent himself and seek a death sentence may* have been a calculated decision. At the competency hearing, Dr. Richard Naham, a psychiatrist, testified that Bloom told him he sought the death penalty so his case would get to the California Supreme Court more quickly. Bloom recited the names of judges on the California Supreme Court and said that the California Supreme Court always reverses death penalty cases. [RT 47 5656–5704.]

## VIII. JURY MISCONDUCT

■ Bloom argues that jury misconduct during the penalty phase deliberations requires a new penalty phase. The alleged misconduct involved the jury's consideration of erroneous law in determining the appropriate sentence. Specifically, Bloom submits that: (1) one juror told the other jurors that with a life sentence, Bloom would be eligible for parole in 7 years; (2) during deliberations several jurors opined that even with a death sentence, Bloom would never be executed; (3) one juror stated that "who knows when an execution would ever happen" and "[Bloom] will probably be 50 years old before anything happens;" (4) two jurors who initially were in favor of life without the possibility of parole ("LWOP") voted for death after a discussion among the jurors regarding the possibility of LWOP being commuted by the governor.

Bloom asserts that the jurors' discussions contained extrajudicial legal information that was clearly erroneous since LWOP prisoners, unlike life prisoners, are *not* eligible for parole after seven years. According to Bloom, the constitutional error occurred when the jury considered evidence that was not presented in open court and which thus deprived him of his constitutional rights to counsel, to confrontation, and to cross-examination.

Bloom contends that the jurors' discussions, or more aptly speculations, about the true meaning of LWOP and the death penalty amounted to constitutional error. Bloom skates over the question of whether the jurors' statements about what occurred during deliberations are even admissible. *See United States v. Maree*, 934 F.2d 196, 201 (9th Cir.1991) (admissibility of juror's statements is a threshold question).

Federal Rule of Evidence 606(b) governs the admissibility of the juror testimony to impeach a verdict:[23] "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of deliberations or to the effect of anything upon his or any juror's minds or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter which he would be precluded from testifying be received for these purposes."

Thus, the court begins with the proposition that it cannot consider any information obtained from the jurors unless the information concerns the receipt of extraneous prejudicial information or the presence of an outside influence.[24]

A careful review of the juror interviews submitted by the parties reveals no evidence of any extraneous information provided to the jury or any outside influence exerted on the jury. Accordingly, the court's inquiry must end here. *See e.g. Silagy v. Peters*, 905 F.2d 986, 1008–1009 (7th Cir.1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); *Fulghum v. Ford*, 850 F.2d 1529, 1535 (11th Cir.1988), *cert. denied*, 488 U.S. 1013, 109 S.Ct. 802, 102 L.Ed.2d 793 (1989).

In sum, neither Bloom's allegations, nor the reports of the juror interviews, raise

---

**23.** Pursuant to Federal Rule of Evidence 1101(e), the Federal Rules of Evidence apply to habeas corpus cases brought under 28 U.S.C. § 2254.

**24.** The cases upon which *Bloom* relies involve information imparted by a third party or obtained through an outside reference. No such allegation has been made in this case. *See Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (bailiff told the deliberating jury that defendant was a "wicked fellow" who was guilty and told another juror that the Supreme Court would correct any improper guilty verdict); *Gibson v. Clanon*, 633 F.2d 851 (9th Cir.1980) (one juror consulted an encyclopedia and another juror looked at a medical dictionary and both jurors shared the information with the remaining jurors), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981); *Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir.1987) (juror consulted a dictionary to define "malice"); and *Bayramoglu v. Estelle*, 806 F.2d 880 (9th Cir.1986) (juror called a law librarian during deliberations to inquire about the differences, including penalties, between first and second-degree murder).

**1378**

anything other than intra-jury matters. Rule 606(b) and related case law prohibit this court from considering the type of information upon which Bloom bases his claim. Accordingly, habeas relief on this issue is denied.[25]

### IX. CONCLUSION

For the reasons discussed above, the court DENIES Bloom's second amended petition for writ of habeas corpus.

This opinion and order constitutes a final disposition of this petition by the court. Consistent with the opinion and order, the court vacates the stay of execution previously granted. If Bloom applies for a certificate of probable cause and the certificate is granted, the court will order another stay of execution which will remain in effect until the Court of Appeals acts upon the appeal or the order to stay the execution. *See* Local Rule 26.8.7(f).

IT IS SO ORDERED.

---

**25.** The Court previously notified the parties of the jury misconduct decision in a lengthier analysis of the issue. *See* Order dated February 22, 1993. The Court stayed that order pending final resolution of the entire petition. That stay order is now vacated.